[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-14223
_____

D.C. Docket No. 1:20-mj-03278-JJO-1


In re:

Sealed Search Warrant and Application for a Warrant by Telephone
or Other Reliable Electronic Means.
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MORDECHAI KORF,
URIEL LABER,
CHAIM SHOCHET,
OPTIMA INTERNATINAL, LLC,
OPTIMA VENTURES, LLC,
OPTIMA MANAGEMENT GROUP, LLC,
OPTIMA ACQUISITIONS, LLC,
NIAGARA LASALLE CORPORATION,
OPTIMA GROUP,
GEORGIAN AMERICAN ALLOYS, INC.,
CC METALS AND ALLOYS, LLC,
FELMAN PRODUCTIONS, LLC,
FELMAN TRADING, INC.,

FELMAN TRADING AMERICAS, INC.,,
GEORGIAN AMERICAN ALLOYS SARL,
GEORGIAN AMERICAN ALLOYS MANAGEMENT, LLC,
OPTIMA FIXED INCOME, LLC,
OPTIMA HOSPITALITY, LLC,
OPTIMA 777, LLC,
OPTIMA 925, LLC,
OPTIMA 925 II, LLC,
OPTIMA 1300, LLC,
OPTIMA 1375, LLC,
OPTIMA 1375 II, LLC,
OPTIMA 55 PUBLIC SQUARE, LLC,
OPTIMA 7171, LLC,
OPTIMA 500, LLC,
OPTIMA CBD INVESTMENTS, LLC,
CBD 500, LLC,

Movants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 30, 2021)

Before MARTIN, ROSENBAUM and LUCK, Circuit Judges.

PER CURIAM:

This case requires us to consider whether the use of a government filter team

to review seized materials that are claimed to be privileged necessarily violates the

privilege holder's rights. Here, the government obtained and executed a search

warrant at a suite of offices where the Optima Family Businesses were located.

Among the materials seized were items from the office of an in-house attorney. The

2

Optima Family Businesses and their owners, managers and controllers (collectively, the "Intervenors") assert attorney-client and work-product privilege over at least some of these documents.

They filed a motion under Rule 41(g), Fed. R. Crim. P., to obtain injunctive relief prohibiting the United States's filter team—which included attorneys and staff who were not involved in the criminal investigation of the Optima Family Companies and the individual owners, managers, and controllers—from reviewing any potentially privileged documents unless either the Intervenors agree or the court, after conducting its own privilege review, orders disclosure.

The district court held a hearing on the Intervenors' motion and imposed a modified filter protocol but denied the Intervenors' request to prohibit anyone from the government from reviewing potentially privileged documents unless the Intervenors agree or the court orders disclosure. The Intervenors now appeal that denial. After careful consideration and with the benefit of oral argument, we now affirm the district court's order denying the Intervenors' motion to enjoin the use of a filter team. We agree with the district court that the Intervenors have not showed a substantial likelihood of success on their argument that government filter teams *per se* violate privilege holders' rights.

3

**I.**

The Northern District of Ohio was conducting a criminal investigation into money laundering, conspiracy to money launder, and wire fraud.  As it followed its leads, it decided it needed to search a suite of offices in Miami, Florida.  So the Federal Bureau of Investigation ("FBI") applied for a search warrant in the Southern District of Florida.

A.    The Search Warrant and Filter Team Protocol

On July 31, 2020, a magistrate judge in the Southern District of Florida issued that search warrant to be executed at the Miami offices of some of the entities that comprise the Optima Family Companies.  The offices that were the subject of the warrant were located in a business suite.

The warrant identified the items to be seized, including records of and concerning Ukrainian nationals Ihor Kolomoisky and Gennadiy Bogolyubov and American citizens Mordechai Korf, Uriel Laber, and Chaim Schochet.  Korf, Laber, and Schochet allegedly own, control, or manage the more than thirty entities that fall under the name "Optima" and have offices in the Miami suite that was the subject of the warrant.

Among the documents sought concerning the five individuals were "all documents for Ihor Kolomoisky, Gennadiy Bogolyubov, Mordechai Korf, Uriel Laber, and Chaim Schochet," from "2008 to the present," including "[r]ecords of

4

receipt of income," "[r]ecords of all accounts and transactions at financial institutions," "[r]ecords of loans and financing transactions," and "all communications between [these persons] and any employee or agent of [any of the entities, persons, or properties of the Optima Family Companies and Subsidiaries and other entities and properties identified in Attachment B.3 to the warrant[1]]." The warrant also authorized seizure of "all emails sent to or from any of the above-referenced Optima-family companies, [and entities, persons, or properties] outlined in Attachment B.3." Besides the seizure of paper records, the warrant authorized seizure, imaging, or copying of all computers or other electronic storage media that might contain the evidence described in the warrant.

If the government identified seized communications that were to or from an attorney during the seizure, the warrant outlined a protocol that would be followed concerning the handling of those materials. That protocol required the following:

> **Filter for Privileged Materials:** If the government identifies seized communications to/from an attorney, the

---

[1] The Optima Family Companies and Subsidiaries identified in Attachment B.3 to the warrant included Optima International, LLC, also known and operated as Optima International of Miami; Optima Ventures, LLC; Optima Management Group LLC; Optima Acquisitions, LLC; Optima Specialty Steel; Kentucky Electric Steel; Corey Steel Company; Niagara LaSalle Corporation; Michigan Seamless Tube, LLC; Optima Group; Georgian American Alloys, Inc.; CC Metals and Alloys, LLC; Felman Production, LLC; Felman Trading, Inc.; Felman Trading Americas, Inc.; Georgian American Alloys Sarl; Georgian Manganese, LLC; Georgian American Alloys Management, LLC; Vartisikhe 2005, LLC; Optima Fixed Income, LLC; Optima Hospitality, LLC; Optima 777 LLC; Optima 925 LLC; Optima 925 II LLC; Optima Harvard Facility LLC; Optima 1300 LLC; Optima 1375 LLC; Optima 1375 II LLC; Optima 55 Public Square LLC; Optima 7171 LLC; Optima 500 LLC; Optima Stemmons LLC; Optima CBD Investments LLC; CBD 500 LLC. Attachment B.3 also identified a number of United States properties, third-party companies, foreign companies, and additional ownership entities.

investigative team will discontinue review until a filter team of government attorneys and agents is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will review all seized communications and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team and the investigative team may resume its review. <u>If the filter team decides that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party or the crime-fraud exception applies), the filter team must obtain a court order before providing these attorney communications to the investigative team.</u>

(the "Original Filter-Team Protocol").

Federal law enforcement agents executed the search warrant on August 4, 2020. As part of that process, agents seized various documents and equipment, including internal servers containing electronic documents and correspondence. In-house lawyers and paralegals worked (or had worked) in the business suite for the Optima Family Companies and other affiliated individuals, and for Korf, Laber, and Schochet. And the seized documents contained some items that were allegedly privileged.

B.     <u>Motion to Intervene and Motion for Injunctive Relief</u>

Following the seizure, Korf, Laber, Schochet and various Optima Family Companies and Subsidiaries (whom we have previously described as the

6

Intervenors) filed a motion to intervene in the search-warrant proceedings in the United States District Court for the Southern District of Florida. The motion advised that the electronic data the government had seized when it executed the warrant contained privileged documents. Contemporaneously with the motion to intervene, the parties filed a document entitled Motion for Preliminary Injunction to Prohibit Law Enforcement Review of Seized Materials Until an Appropriate Procedure for Review of Privileged Items is Established ("Motion for Injunctive Relief").

Asserting that the execution of the search warrant was the functional equivalent of a law-office search, the Motion for Injunctive Relief primarily challenged the use of the filter team to review privileged documents. The Intervenors objected to the protocol's limited provision of judicial review for potentially privileged documents since review was available only if a communication was clearly sent "to/from attorneys." In the Intervenors' view, this exception for judicial review was inadequate because (1) the substance of the privileged information would initially be exposed to filter attorneys before judicial review, and (2) the scope of the documents subject to judicial review was underinclusive. The Intervenors contended that the protocol did not account for the existence of documents subject to the work-product doctrine, nor did it account for the existence of communications between non-lawyers reasonably necessary for the transmission of attorney-client communication.

7

The Intervenors also expressed particular concern over the government's review of the privileged documents because in May of 2019, a bank filed suit in Delaware against Korf, Laber, Schochet, and various Optima Family Companies, alleging fraudulent activity.[2] *See Joint Stock Co Comm. Bank PrivatBank v. Igor Valeryevich Kolomoisky, et al.*, Del. Ch. C.A. No. 2019-0377-JRS (May 21, 2019). According to the Intervenors, the transactions and occurrences in the Delaware case overlapped with and were "substantively identical to the factual predicate for the grand jury investigation [in the Northern District of Ohio]" associated with the search warrant here.[3]     Based on this overlap, the Intervenors claimed a "clear risk" existed that "the government will be able to view a roadmap to the privilege-holders['] defenses."  To prevent these alleged harms, the Intervenors sought to perform their own privilege review of the documents and, more generally, they sought an injunction to prohibit law enforcement from reviewing the seized materials until a more protective protocol was put into place.

---

[2] The PrivatBank lawsuit alleges Racketeer Influenced and Corrupt Organization ("RICO") violations that arise out of "a series of brazen fraudulent schemes orchestrated by Ukranian oligarchs and . . . Kolomoisky and . . . Bogolyubov . . . and their agents . . . to acquire hundreds of millions of dollars-worth of U.S. assets through the laundering and misappropriation of corporate loan proceeds issued by PrivatBank."    The Intervenors note that Korf, Laber, Schochet, and the Optima Family Companies have been defending against the lawsuit since it was filed on May 21, 2019.

[3] The Intervenors also claimed that the Delaware case overlapped with civil forfeiture claims filed in the Southern District of Florida.   Those claims sought forfeiture of the properties listed in Attachment B.3 of the search warrant, which were owned by many of the Intervenors.

In mid-August 2020, the magistrate judge granted the motion to intervene and ordered the parties to meet and confer to see if they could narrow the issues addressed in the Motion for Injunctive Relief.    In the meantime, with the agreement of the Intervenors, the government continued processing the seized materials, which meant it could arrange to have the materials copied and scanned, but it could not review their contents.  Within forty-eight hours of processing any particular record, the court required, the government was to provide a copy of that record to counsel for the Intervenors.

In the government's response to the Motion for Injunctive Relief, the government expressed deep concern over the Intervenors' proposal that they be trusted with the task of reviewing for privilege on their own.  According to the government, that type of approach would cause its investigation to cease in its tracks.

The government also pushed back on the Intervenors' assertion that the search was the equivalent of a law-office search.  It emphasized that within the multi-office complex, only a single office was used by a single in-house lawyer, and although three other lawyers had previously served as in-house counsel over the past decade, they no longer had offices there.  Besides that, the government noted, it had seized only three boxes of materials from the in-house lawyer's office, and those boxes had

been segregated and marked.[4]    Ultimately, the government asked that the district court deny the Motion for Injunctive Relief or, in the alternative, limit the scope of the Intervenors' proposed review of the documents seized.  It further requested that its own filter team be afforded an opportunity to review all the documents seized.

In late August 2020, the parties attempted to resolve the issues relating to the document review.  During the course of these efforts, the government provided an inventory of the items seized.  Ultimately, though, the parties were not able to agree on a modified approach.

C.    Resolution of Motion for Injunctive Relief

Because the parties were unable to resolve the dispute, the magistrate judge heard arguments by the parties in mid-September.  A few days later, the magistrate judge entered an order granting in part and denying in part the Motion for Injunctive Relief.

First, the magistrate judge rejected the Intervenors' argument that the use of government filter teams to conduct privilege reviews is *per se* legally flawed.

---

[4] In its opposition to the Motion for Injunctive Relief, the government discussed how agents "carefully watched for potentially privileged materials" on the day the search warrant was executed.  And when they came across information that might be privileged, they stopped searching and separately designated "filter agents" (*i.e.*, non-investigative agents) to review and segregate the materials.  Additionally, *only filter agents* searched the in-house lawyer's office, from where the three boxes of materials were seized.  As we have noted, those materials were segregated, and the filter team informed the FBI's document processors that they were to be treated as potentially privileged.  Of the three offices occupied by unrelated lawyers, only one had relevant material, which was collected in a single box.

10

Nevertheless, the magistrate judge voiced reservations about the Original Filter-Team Protocol and concluded it did not provide sufficient protection. He found the case differed from the ordinary search of a business since the Intervenors anticipated asserting the attorney-client or work-product privileges over numerous communications relating to matters at issue in the Delaware RICO litigation and the two civil forfeiture actions brought in the Southern District of Florida. And he expressed concern that if the documents were inadvertently disclosed to the investigation and prosecution team, the government could become privy to privileged materials concerning the Delaware litigation. For these reasons, the magistrate judge concluded that the Intervenors had showed a likelihood of success on the merits with respect to the Original Filter-Team Protocol as applied to the seized items. To address the perceived problem, the magistrate judge decided that allowing the Intervenors to conduct the initial privilege review would protect both the Intervenors and the government from the inadvertent disclosure of privileged materials to the investigation and prosecution team.

Second, the magistrate judge determined that the Intervenors showed a danger of irreparable harm with respect to the Original Filter-Team Protocol, since it required the filter team to segregate only communications that were "to/from attorneys." Because of the potentially underinclusive way of identifying privileged communications, the magistrate judge reasoned, the Original Filter-Team Protocol

11

presented a danger that some items protected by the attorney-client or work-product privileges might be inadvertently disclosed to the investigative team.

Third, when the magistrate judge analyzed the balance of the harms, he found them to favor enjoining the Original Filter-Team Protocol.

Finally, although the magistrate judge concluded that the parties had identified important competing public interests, he ruled that the public interest would be best served by applying a modified filter-team protocol, which he then described. Under the new protocol, the Intervenors were to conduct an "initial privilege review of all seized items [and] provide a privilege log to the government's filter team." Then the government's filter team, which the magistrate judge required to be composed of attorneys and staff from outside the investigating office (the United States Attorney's Office for the Northern District of Ohio's Cleveland branch office), would have the opportunity to challenge any privilege designation on that log. Although the filter team would be "permitted to review any item on the privilege log in order to formulate a challenge[,]" the investigation and prosecution team would be prohibited from receiving any items on the privilege log "unless agreed to by the parties or the Court/special master ha[d] overruled the privilege."

The more specific details of the modified filter-team protocol the magistrate judge imposed are set forth below:

> a. The government shall process the items and provide them to the movants, on a rolling basis, so that the movants

12

may perform the initial privilege review. Within **forty-five (45) days of receipt** of these items, the movants shall release all non-privileged items to the government's investigative/prosecution team and provide a privilege log to the government's filter team for all items for which they assert a privilege.

b. The government's filter team shall be comprised of attorneys and staff from outside the United States Attorney's Office for the Northern District of Ohio's Cleveland branch office. The filter team shall not share a first level supervisor with anyone on the investigative/prosecution team. Any supervisor involved in the filter team review shall be walled off from the underlying investigation.

c. The government's filter team is permitted to review any items listed on the movants' privilege log and may challenge any of the movants' privilege designations.

d. The government's filter team and the movants' counsel shall confer and attempt to reach a resolution as to those items challenged by the government's filter team.

e. If the parties are unable to reach a resolution, the parties shall file a joint notice with the Court. Either the Court or a special master shall rule on the parties' privilege disputes.

f. The filter team will provide to the investigative team only those items for which the parties agree or for which the privilege has been overruled.

(the "Modified Filter-Team Protocol").

D.    Objection to the Order and Appeal to the District Court Judge

With the district court, the Intervenors filed an appeal from and objections to the magistrate judge's order and revised protocol. The Intervenors suggested the

court should review materials first or use a special master to evaluate claims of privilege. They sought for the district court to vacate the portion of the Modified Filter-Team Protocol that authorized a filter team composed of government employees to review documents identified as privileged.

The district court set a hearing on the matter and after hearing from the parties, entered an order overruling the Intervenors' objections and affirming the magistrate judge's revised protocol. Among other conclusions, the district court reasoned that improper disclosure of privileged documents to the prosecution team was not a concern since "[n]ot only do [the Intervenors] have the opportunity to review the documents *before* the filter team, but any documents identified by the [Intervenors] in their privilege log may not be released to the prosecution team until the parties agree to do so, or the Court or special master has ruled on the privilege objections." In this way, the district court found the Modified Filter-Team Protocol incorporated "several layers of safeguards that prevent[ed] anyone other than the filter team and [the Intervenors] from reviewing the potentially privileged documents." The district court also expressed concern that requiring the district-court judge, magistrate judge, or special master to routinely review lawfully seized documents would be too burdensome. Overall, the district court determined that the Modified Filter-Team Protocol had been carefully crafted to afford protection of the attorney-client and work-product privileges.

14

This appeal ensued.

## II.

### A.    We have jurisdiction over this appeal

We begin by considering our jurisdiction.  We review *de novo* whether we have jurisdiction to decide this interlocutory appeal, before we can address the merits of the case.  *Doe No. 1 v. United States*, 749 F.3d 999, 1003 (11th Cir. 2014).

The government contends that we lack jurisdiction because of the procedural posture of this case.  In support of this contention, the government notes that the Intervenors invoked Rule 41(g) of the Federal Rules of Criminal Procedure—which governs motions for return of property—as a basis for seeking to bar government employees from reviewing lawfully seized materials.  The government relies on *DiBella v. United States*, 369 U.S. 121, 82 S. Ct. 654 (1962), to argue that the Intervenors' case does not involve the "narrow circumstances" under which the denial of a Rule 41(g) motion is immediately appealable.  As a result, the government asserts, we do not have jurisdiction over the Intervenors' appeal.

Generally, "courts of appeals 'have jurisdiction of appeals from all final decisions of the district courts of the United States[.]'" *Doe No. 1*, 749 F.3d at 1004 (quoting 28 U.S.C. § 1291) (alteration adopted).  In *DiBella*, the Supreme Court considered whether orders on two preindictment motions to suppress the use of evidence in a forthcoming criminal trial (evidence that was allegedly procured

15

through an unreasonable search and seizure) were exceptions to the final-judgment rule and immediately appealable as a final order. 369 U.S. at 121-23. It decided they were not.

To determine whether the district court's orders were immediately appealable as a final judgment, the *DiBella* court said the orders must be "independent" from the judgment. 369 U.S. at 126. In other words, they must be "fairly severable from the context of a larger litigious process." *Id.* at 127 (citation and quotation marks omitted). "Only if the motion is solely for return of property and is in no way tied to a criminal prosecution in esse [(in actual existence)] against the movant can the proceedings be regarded as independent," and an immediate appeal taken therefrom. *See id.* at 131–32. This is known as the *DiBella* test. The Supreme Court held the pre-indictment suppression motions failed that test because motions to suppress will "necessarily determine the conduct of the trial and may vitally affect the result" such that they are intertwined with the entire case. *Id.* at 127 (quotation marks omitted).

*DiBella* also considered two other principles that reinforced its determination. First, it concluded that suppression orders were not of the type "where the damage of error unreviewed before the judgment is definitive and complete." *Id.* at 124. Of course, that is so because if the district court erred in denying the motion to suppress, any damage could be fixed on appeal by excluding the documents at issue and remanding for a new trial or dismissal. Second, noting the "Sixth Amendment

16

guarantees [of] a speedy trial," the Court expressed concerns about "delays and disruptions" that might interfere with "the effective and fair administration of the criminal law," if pre-indictment suppression motions could be immediately appealed.[5] *Id.* at 126; *see also id.* at 129 ("The fortuity of a pre-indictment motion may make of appeal an instrument of harassment, jeopardizing by delay the availability of other essential evidence."). With these considerations in mind, the Court ruled that "the mere circumstance of a pre-indictment motion does not transmute the ensuing evidentiary ruling into an independent proceeding begetting finality even for purposes of appealability." *Id.* at 131.

Because the Intervenors moved the district court for the return of their property under Rule 41(g), we must apply the *DiBella* test to determine whether we have jurisdiction over their appeal.[6] *See, e.g.*, *Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th 593, slip op. at 6–7 (5th Cir. 2021); *In re Search of Elec. Commc'ns in the Acct. of chakafattah gmail.com at Internet Serv. Provider Google, Inc.*, 802 F.3d 516, 530 (3d Cir. 2015); *In re Sealed Case*, 716 F.3d 603, 605–09 (D.C. Cir. 2013); *In re Grand Jury*, 635 F.3d 101, 103 (3d Cir. 2011). We believe

---

[5] Both the cases before the Court in *DiBella* involved defendants who had been arrested but not yet indicted when they filed their suppression motions. 368 U.S. at 122-23.

[6] The parties dispute whether the Intervenors actually invoked Rule 41, but we believe this is the proper way to come before the court to seek an injunction regarding the government's use of a filter team to review seized documents. *Cf. Richey v. Smith*, 515 F.2d 1239, 1243 (5th Cir. 1975) (explaining that motions for the return of property are governed by equitable principles, whether viewed as based on Rule 41(g) or on a federal court's general equitable jurisdiction).

17

the Intervenors' claims are sufficiently independent from any forthcoming criminal judgment to pass the *DiBella* test here.

The Intervenors clearly seek only the return of their property. They sought to prohibit the government from reviewing seized materials until a protocol protective of the attorney-client privilege was ordered. To protect the privileged materials, they primarily asked for the court to order the return of the seized documents to prevent law enforcement from reviewing the materials and suggested, in the alternative, that an independent party could act as the filter. They do not seek to invalidate the seizure—indeed, the government currently remains in possession of the materials seized. *See* Oral Argument Recording at 2:36–44 (July 1, 2021) ("To be clear as we sit here today hearing the case, the materials are safe. They are in the possession of the government."). Nor do they seek to suppress the seized materials or ask for any other relief. This is sufficient to conclude the motion was solely for the return of property. *See Richey*, 515 F.2d at 1242–44 & n.5 (noting that by abandoning the motion to suppress the "*DiBella* test would seem to be satisfied," and that "prayers for injunctive relief to prevent examining, analyzing, scheduling, or copying of the documents [are] an integral part of the . . . motion for return of property").

Neither was the Intervenors' motion in any way tied to an ongoing criminal prosecution. *See DiBella*, 369 U.S. at 131–32. *DiBella* suggested there was a criminal prosecution "in esse," or in existence, "[w]hen *at the time of the ruling* there

18

is outstanding a complaint, or a detention or release on bail following arrest, or an arraignment, information, or indictment." *Id.* (emphasis added). There is currently no complaint, arrest, detention, or indictment in this case. Therefore, "according to the literal language of *DiBella*," there is no criminal prosecution in esse. *United States v. Glassman*, 533 F.2d 262, 262–63 (5th Cir. 1976).

But the inquiry doesn't stop there. In *In re Grand Jury Proceedings* ("*Berry*"), 730 F.2d 716 (11th Cir. 1984) (per curiam), where this Court previously applied *DiBella* to a motion characterized as seeking the return of property, we said that a "pending criminal investigation, even in the absence of a formal charge," may be enough to show that the motion is tied to a criminal prosecution. *Id.* at 717. *Berry* explained that determining whether a motion meets the "no way tied to an ongoing criminal prosecution" rule from *DiBella* may be relatively straightforward from the procedural standpoint of the case. But *Berry* directed us to consider not only the existence of a pending criminal investigation, but also to look to the purpose of the motion for the return of property. *See id.* at 717–18. If it "is obvious from a reading of the motion that appellants are attacking the validity of the search and seizure under the fourth amendment," then it is "clear that the motion is tied to the ongoing criminal investigation and to issues that may be litigated in any subsequent criminal proceedings arising out of the seizure." *Id.* at 718; *see also Glassman*, 533 F.2d at

19

262–63 ("Only if this motion was a collateral attempt to retrieve property and not an effort to suppress evidence in related criminal proceedings is it appealable.").

The Intervenors are subjects of an ongoing criminal investigation. But under *Berry*, an ongoing criminal investigation isn't—by itself—dispositive. *See Berry*, 730 F.2d at 717 ("A pending criminal investigation, even in the absence of a formal charge, *may* be sufficient to show that the motion is tied to an existing criminal prosecution." (emphasis added)). And for the same reasons we have already described, the Intervenors' Rule 41(g) motion in no way attacked the validity of the search and seizure of the materials.

The Intervenors sought equitable relief in the form of an injunction in a civil case to prohibit the government from reviewing seized materials until a protocol protective of the attorney-client privilege was ordered. They argued they could prove the four elements required to obtain an injunction in a civil case. And they sought return of the seized documents to protect privileged materials by preventing law enforcement from reviewing the materials, asking in the alternative for an independent party to act as the filter. Both the magistrate judge and the district court treated the motion as a civil preliminary injunction to protect privileged documents. So it is clear that the purpose of the Intervenors' motion is not to attack the validity of the search and seizure under the Fourth Amendment and is therefore not tied to any criminal prosecution. *Cf. Berry*, 730 F.2d at 717–18.

20

Appellate jurisdiction here also satisfies the concerns underlying the need for appellate review of interlocutory orders as explained in *DiBella*. *See* 369 U.S. at 124–29. The damage from any error in the district court would be "definitive and complete," if interlocutory review is not available, and would outweigh any "disruption caused by the immediate appeal." *Id.* "The whole point of privilege is privacy." *Harbor Healthcare*, 5 F.4th 593, slip op. at 10. So the Intervenors' interests in preventing the government's wrongful review of their privileged materials lie in safeguarding their privacy. *See id.* Once the government improperly reviews privileged materials, the damage to the Intervenors' interests is "definitive and complete." *DiBella*, 369 U.S. at 124.

Contrary to the government's suggestion, suppression is not an adequate remedy for any violations. We cannot know whether criminal charges will be brought against the Intervenors. Yet suppression protects against only "the procedural harm arising from the introduction [at a criminal trial] of unlawfully seized evidence." *Harbor Healthcare*, 5 F.4th 593, slip op. at 12. If the Intervenors are not charged, they will not have suppression available to them as a potential remedy. *See id.* And even if they are charged and may seek suppression, suppression does not redress the government's intrusion into the Intervenors' personal and privileged affairs. *See id.*

21

In contrast, Rule 41(g) can.  It offers the remedy of returning to the Intervenors any improperly seized documents protected by privilege *before* the government has reviewed them.  *See* Fed. R. Crim. P. 41(g); *see also Harbor Healthcare*, 5 F.4th 593, slip op. at 12.  Unlike suppression, that is a remedy that can redress any potential injury by ensuring it does not occur in the first place.  And if a district court incorrectly denies Rule 41(g) relief when it is required, immediate review is necessary to preserve that same remedy of return of the documents before the government reviews them.  Review later would be incapable of vindicating the Intervenors' privacy interests.  *See Richey*, 515 F.2d at 1243 n.6 ("[A]ppellate review might be appropriate where to deny the right to appeal at a specific time would in effect deny the right to appeal at all on the specific issue.").

Interlocutory review also comports with *DiBella*'s concern that the motion for injunctive relief at issue here is severable and distinct from any other proceedings. *See DiBella*, 369 U.S. at 126–27.  Indeed, the Intervenors' motion, which seeks only to address the review protocol as it relates to allegedly privileged documents and to obtain return of privileged documents, "is a discrete action, not tied to any other civil or criminal proceedings, [so granting] review would not frustrate the policy against piecemeal review in federal cases." *Richey*, 515 F.2d at 1243 n.6.

As for *DiBella*'s concern for delaying criminal proceedings, that can be minimized by expediting review of motions of this type.  The merits of a motion

22

seeking only injunctive relief in the form of a preferred protocol for the government's review of allegedly privileged materials and the return of those items that the protocol determines are protected are not complex. A review protocol for privileged documents either does or does not sufficiently protect the interests of the person or entity that owns the allegedly privileged documents. And we are hopeful that our analysis below on the merits, *see infra* at Section II.B., will make that straightforward issue even simpler. In short, the specific motion before us here meets the *DiBella* test.[7]

**B.** **The district court did not abuse its discretion in issuing the Modified Filter-Team Protocol and denying the Intervenors' motion to the extent it sought to preclude any government review of documents before the Intervenors agreed or the court ordered disclosure**

---

[7] The government relies on other cases to further its jurisdiction argument, but each is distinguishable. First, it points to *Sealed Case*, 716 F.3d 603, and *Grand Jury*, 635 F.3d 101, to argue that as in those cases, the purpose of the Intervenor's motion was "to place an additional layer of screening between the government and the seized materials, inevitably causing delays and restrictions that could shape the course of the criminal investigation and the content of the case" the government will eventually present. But both of those cases involved challenges to the validity of the search warrant, so under *Berry*, they *would* be tied to an ongoing criminal prosecution. The D.C. Circuit's and the Third Circuit's holdings that they did not have jurisdiction do not apply here.

The government also makes a fleeting reference to *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009), in which the Supreme Court noted that rulings on privilege are typically not immediately appealable. That case, though, did not involve a claim that the government was invading privilege for the purpose of possibly taking action against the privilege holders. Not only that, but *Mohawk* involved a claimant who was a party to the suit and could appeal a final judgment. The *Mohawk* Court did not address appeals like this one, by privilege claimants who are intervenors in a proceeding ancillary to a criminal investigation. *See Doe No. 1*, 749 F.3d at 1007.

The Intervenors assert that the district court abused its discretion in denying their motion for a preliminary injunction to prohibit any federal prosecutors or their agents—including the filter team—from reviewing documents the Intervenors identify as privileged unless the Intervenors agree or the court permits government review after first conducting its own privilege review.  We disagree.

To obtain a preliminary injunction, the movant must clearly establish four showings:  (1) it has "a substantial likelihood of success on the merits;" (2) it will suffer "irreparable injury" in the absence of the injunction sought; (3) any threatened harm to the movant that might be inflicted because of the proposed injunction will outweigh any damage to the opposing party; and (4) the injunction sought "would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).  We have said that a preliminary injunction is an "extraordinary and drastic remedy." *Id.*

On appeal, we review the denial of a preliminary injunction for abuse of discretion. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). A district court abuses its discretion if "its factual findings are clearly erroneous, . . . it follows improper procedures, . . . it applies the incorrect legal standard, or . . . it applies the law in an unreasonable or incorrect manner." *Id.* at 1247.  Under this standard, a district court may make any of a range of permissible choices. *Id.*

24

We have recognized that appellate review of a preliminary-injunction decision is "exceedingly narrow" because of the expedited nature of the proceedings. *Wreal*, 840 F.3d at 1248. This means our review is deferential. *Id.* We have commented that appellants face a "tough road" in establishing the four prerequisites to obtain a preliminary injunction. And on appeal, they "must also overcome the steep hurdles of showing that the district court clearly abused its discretion in its consideration of each of the four prerequisites." *Id.* The "failure to meet even one [factor] dooms [an] appeal." *Id.*

While we have described a showing of irreparable injury as "the sine qua non of injunctive relief," *Siegel*, 234 F.3d at 1176, here, we need proceed no further than consideration of the Intervenors' likelihood of success on the merits. We conclude the district court did not abuse its discretion in determining that the Intervenors did not show a substantial likelihood of success on their position that government filter teams are *per se* violative of their rights. Nor did it abuse its discretion in effectively concluding that the Intervenors did not show a substantial likelihood of success on their argument that the Modified Filter-Team Protocol violates their rights. Indeed, because of the great weight of authority that supports the district court's conclusions here, our holding on this front is not even close.

We begin by recognizing that the attorney-client and work-product privileges play a vital "role in assuring the proper functioning of the criminal justice system"

25

and provide a means for a lawyer to prepare her client's case. *See United States v. Nobles*, 422 U.S. 225, 238 (1975). They are deeply important and must be respected. Nevertheless, they are not inviolate. We have recognized exceptions that allow for their breach. For example, when the crime-fraud exception applies, it effectively invalidates the privileges.[8] *See In re Grand Jury Investigation*, 842 F.2d 1223 (11th Cir. 1987). But to be sure, any filter protocol must appropriately take into account the importance of these privileges.

With that in mind, we turn to the Modified Filter-Team Protocol. Significantly, the Modified Filter-Team Protocol allows the Intervenors to conduct the initial privilege review. It also requires the Intervenors' permission or court order for any purportedly privileged documents to be released to the investigation team. This means that the filter team cannot inadvertently provide the investigation team with any privileged materials. For three reasons, we conclude that this Protocol suffices under the law.

*First*, though we have not previously issued any published opinions on point, some of our sister circuits have approved of the use of a walled-off government filter team to review documents for privilege. In *United States v. Jarman*, 847 F.3d 259

---

[8] The crime-fraud exception applies if (1) the client was involved in or was planning criminal conduct when he sought advice of counsel, or that he committed a crime after he received the benefit of legal counsel; and (2) "the attorney's assistance was obtained in furtherance of the criminal . . . activity or was closely related to it." *In re Grand Jury Investigation*, 842 F.2d at 1226.

(5th Cir. 2017), for instance, the Fifth Circuit upheld the filter team's screening for privileged materials. *Id.* at 266. There, the court stated that the filter team process was "designed to protect [the] privileged information." *Id.* The Second, Third, Fourth, Seventh, Eighth, Ninth and Tenth Circuits, in at least some cases, have also either approved of or recognized and declined to criticize the use of government filter teams to screen materials for privilege before items are released to the investigators in the case. *See*, *e.g.*, *S.E.C. v. Rajaratnam*, 622 F.3d 159, 183 & n.24 (2d Cir. 2010); *Search of Elec. Commc'ns in the Acct. of chakafattah gmail.com at Internet Serv. Provider Google, Inc.*, 802 F.3d at 530; *United States v. Myers*, 593 F.3d 338, 341 n.5 (4th Cir. 2010); *United States v. Proano*, 912 F.3d 431, 437 (7th Cir. 2019); *United States v. Howard*, 540 F.3d 905, 906 (8th Cir. 2008); *United States v. Christensen*, 828 F.3d 763, 799 (9th Cir. 2015); *United States v. Ary*, 518 F.3d 775, 780 (10th Cir. 2008).

*Second*, the Intervenors cite no cases for the broad remedy they seek: a holding that government agents "should never . . . review documents that are designated by their possessors as attorney-client or work product privileged" until after a court has ruled on the privilege assertion." Nor has our research unearthed any.

*Third*, to the extent that courts have disapproved of particular filter-team protocols, the Modified Filter-Team Protocol suffers from none of the defects those

27

courts found disqualifying. The Intervenors rely primarily on *In re Grand Jury Subpoenas 04-124-03 and 04-124-05* ("*Winget*"), 454 F.3d 511 (6th Cir. 2006), and *In re: Search Warrant Issued June 13, 2019* ("*Baltimore Law Firm*"), 942 F.3d 159 (4th Cir. 2019), to support their contention that the Modified Filter-Team Protocol violated their rights. But both cases are materially different.

*Winget* arose when the plaintiffs there learned that a third party had received a grand-jury subpoena for documents, some of which allegedly were subject to the plaintiffs' claims of privilege. 454 F.3d at 512. There, the district court permitted a government-filter-team protocol under which the government's filter team—not the purported privilege possessors or the court—determined which documents were privileged. *See id.* at 515. Only if the team found a document definitely or possibly privileged did it submit it to the court for a privilege review. *See id.* at 515, 518 n.5.

The Sixth Circuit held that this protocol failed to sufficiently protect the plaintiffs' claims of privilege. First, the court questioned the use of a government filter team in non-search-warrant situations like the one at issue there. *Id.* at 522–23. But after a search warrant is executed, the court recognized, the government has physical control of potentially privileged documents. *Id.* at 522. So, the court reasoned, "the use of the [filter] team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege." *Id.* at 522–23. And second, the court expressed concern that a government filter team that takes

the first pass at the materials for privilege can miss privileged items and mistakenly pass them along to the investigative team. *Id.* at 523. In other words, a protocol of that sort imposes no check on any of the filter team's determinations that an item is not privileged. *Id.*

But neither of these problems exists here. In fact, the records here are already in the government's possession as the result of the execution of a search warrant, so under *Winget*, the use of a filter team to review them is "respectful of, rather than injurious to, the protection of privilege." *Id.* at 522–23. And unlike in *Winget*, under the Modified Filter-Team Protocol, the Intervenors identify all allegedly privileged materials in the first instance. So there is no possibility here that privileged documents will mistakenly be provided to the investigative team.

*Baltimore Law Firm* is also different from the Intervenors' case in important ways. There, the government seized documents in accordance with a search warrant. *Baltimore Law Firm*, 942 F.3d at 164. The search warrant was for a lawyer's records as they concerned one specific client. *Id.* at 166. In seizing that lawyer's materials, the government took all the lawyer's email correspondence, including his correspondence with clients other than the one whose materials were authorized to be seized. *Id.* at 166–67. In fact, of the 37,000 emails seized from the lawyer's inbox, only 62 were from the designated client or contained that client's surname. *Id.* at 167. Similarly, only 54 of the 15,000 emails seized from the lawyer's "sent

29

items" folder had been sent to the designated client or contained that client's surname. *Id.* The vast majority of the rest of the correspondence was from other attorneys and concerned other attorneys' clients who had no connection at all with the investigation that led to the search warrant. *Id.* But notably, some of those other clients were being investigated by or prosecuted by the same United States Attorney's Office for unrelated crimes. *Id.*

At the time the magistrate judge issued the search warrant, the magistrate judge also authorized a government filter-team protocol. *Id.* at 165. Like under the *Winget* protocol, the *Baltimore Law Firm* protocol allowed the government filter team to determine initially whether items were potentially privileged or not. *Id.* at 166. And when the filter team found materials not to be privileged, it could forward them directly to the investigative team. *Id.* As for items the filter team deemed privileged or potentially privileged, the filter team could provide those materials to the investigative team only if the parties agreed or the court concluded after review that the items could be turned over. *Id.* at 166.

The Fourth Circuit held that the filter-team protocol that the magistrate judge approved was legally flawed.[9] *Id.* at 176. As relevant here, it objected first to the

---

[9] The district court modified the protocol to require the filter team to forward any materials it deemed nonprivileged to the plaintiff or the court for approval before providing them to the investigative team. *Baltimore Law Firm*, 942 F.3d at 170. A concurring opinion in *Baltimore Law Firm* suggests that the majority decision did not address or otherwise call into question the modified filter protocol, which was more similar to the protocol at issue here. *See id.* at 169–70,

30

protocol's assignment of judicial functions to the executive branch. *Id.* In particular, the court noted that the resolution of a privilege dispute is a judicial function. *Id.* So the protocol should not have authorized the government filter team to determine in the first instance whether materials were privileged. *Id.* at 176–77. The court also concluded that the magistrate judge should not have authorized the filter-team protocol *ex parte* and before the magistrate judge knew what had been seized. *Id.* at 178. Noting that the great majority of emails seized appeared not to be relevant to the client who was the subject of the government's investigation, the court opined that that information should have affected the protocol that was put into place. *Id.* Not only that, the court explained, but the magistrate judge should have waited to determine the protocol in an adversarial proceeding where the privilege holder could be heard. *Id.* at 178–79.

As with *Winget*, none of the concerns the Fourth Circuit identified in *Baltimore Law Firm* apply here. Though the magistrate judge originally approved the Original Filter-Team Protocol *ex parte*, before the investigative team could review any documents, the court held an adversarial hearing and, after considering the Intervenors' concerns, put the Modified Filter-Team Protocol into place. Also unlike in *Baltimore Law Firm*, this case involves no claims that the majority of

---

183–84. And the concurring opinion noted that the majority opinion did not suggest the modified protocol "impermissibly usurp[ed] a judicial function." *Id.* at 184 (Rushing, J., concurring).

31

seized materials were both privileged and irrelevant to the subject of the investigation. And finally, the Modified Filter-Team Protocol did not assign judicial functions to the executive branch. Rather, and as we have noted, under the Modified Filter-Team Protocol, the Intervenors have the first opportunity to identify potentially privileged materials. And before any of those items may be provided to the investigative team, either the Intervenors or the court must approve. Put simply, the Modified Filter-Team Protocol complies with the recommendations both the Sixth and Fourth Circuits have made concerning the use of filter teams.[10]

So once again, we return to the observation that the Modified Filter-Team Protocol appears to us to comply with even the most exacting requirements other courts that have considered such protocols have deemed appropriate. In short, the Intervenors have not clearly established a substantial likelihood of success on the merits.

## III.

For the reasons we have explained, we affirm the district court's order.

**AFFIRMED.**

---

[10] We do not prejudge other filter protocols that are not before us. Rather, we evaluate only the Modified Filter-Team Protocol and simply conclude that, under the circumstances here, that Protocol suffices, even under frameworks of analysis that other Circuits have used to invalidate other protocols.